# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| ERICA T. SPATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CV1423 LMB |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Erica T. Spates for Supplemental Security Income under Title XVI of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (Doc. No. 15). Defendant filed a Brief in Support of the Answer. (Doc. No. 20).

## Procedural History

On August 24, 2009, plaintiff filed an application for Supplemental Security Income, claiming that she became unable to work due to her disabling condition on August 1, 2009. (Tr. 222-24). This claim was denied initially and, following an administrative hearing, plaintiff's claim

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 21, 2011. (Tr. 85-88, 86-102).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 20, 2012.  (Tr. 9, 1-4).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.     First ALJ Hearing

Plaintiff's first administrative hearing was held on August 5, 2010.  (Tr. 47).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Delores E. Gonzalez.  (Id.).

The ALJ examined plaintiff, who testified that she was twenty-two years of age, not married, and has a two-year-old child.  (Tr. 49).  Plaintiff stated that she lives in an apartment with her aunt and her daughter.  (Tr. 50).  Plaintiff testified that the apartment is hers, and that her aunt has been living with her for a year-and-a-half to help her.  (Id.).  Plaintiff stated that her aunt works in the home health care field.  (Id.).

Plaintiff testified that she completed the twelfth grade after dropping out for a period of time.  (Tr. 51).  Plaintiff stated that she dropped out of school because she did not enjoy being in school with a lot of people.  (Id.).

Plaintiff testified that her daughter's father lived with her before her aunt moved in.  (Id.).  Plaintiff stated that her daughter's father did not work.  (Id.).

Plaintiff testified that she weighed 114 pounds.  (Tr. 52).

Plaintiff stated that she is able to read, perform simple arithmetic, and write.  (Id.).

Plaintiff testified that she has a checking account. (Id.).

Plaintiff stated that she served time in jail in December 2009 for being involved in a fist-fight with her sister in June of 2009. (Tr. 53).

Plaintiff testified that she receives welfare and food stamps. (Tr. 54).

Plaintiff stated that she last worked for a child care provider in 2009. (Tr. 55). Plaintiff testified that she helped take care of children ranging in age from infants to five-years-old at this position. (Id.). Plaintiff stated that she left this position after a couple of months because her employer did not give her enough hours. (Id.). Plaintiff testified that she had a disagreement with a parent at this position because the parent accused her of putting the wrong diaper on her child. (Id.).

Plaintiff stated that she worked at State King as a cashier at a concession stand. (Tr. 56). Plaintiff testified that she had no difficulty operating the cash register. (Id.). Plaintiff stated that she worked at this position for about five months, and left because she was seven months pregnant and her doctor placed her on bed rest. (Id.).

Plaintiff testified that she worked as a sales associate at Wal-Mart. (Tr. 57). Plaintiff stated that she folded clothes, and stocked merchandise at this position. (Id.). Plaintiff testified that she was terminated from this position because she had problems with her co-workers giving her instructions. (Tr. 58). Plaintiff stated that she got along well with her supervisors. (Id.).

Plaintiff testified that she also worked from home braiding hair for a period of time. (Id.).

Plaintiff stated that she worked for a temp service, API. (Tr. 59). Plaintiff testified that she operated a machine in a mail room at this position. (Id.).

Plaintiff stated that she is unable to work because she does not like "people telling [her]

what to do." (Tr. 61). Plaintiff testified that she experiences mood swings and was diagnosed with bipolar disorder in high school. (Id.). Plaintiff stated that she saw a psychiatrist when she was in high school, and she currently sees Dr. A.G. Lipede. (Id.). Plaintiff testified that she first saw Dr. Lipede monthly, and she started seeing him every two weeks one month prior to the hearing. (Tr. 62).

Plaintiff stated that she was taking Seroquel[2] and sleeping pills at the time of the hearing. (Id.). Plaintiff testified that her medications help her. (Id.). Plaintiff stated that she is no longer angry, she does not hear voices, and she can function when she takes her medication. (Id.).

Plaintiff testified that she started hearing voices and seeing her deceased brother after her brother was killed in a shooting that she witnessed. (Tr. 63). Plaintiff stated that the shooting occurred at a park where she and her friends gather to socialize. (Id.).

Plaintiff stated that she has difficulty lifting due to back pain. (Tr. 65). Plaintiff testified that she took Percocet[3] for back pain after she was involved in an automobile accident. (Id.). Plaintiff stated that she underwent back x-rays, which were normal, and she no longer takes pain medication. (Tr. 66).

Plaintiff testified that the Seroquel makes her drowsy. (Tr. 67).

Plaintiff stated that her driver's license was suspended because she missed a court date for a citation of improper plates. (Tr. 68).

Plaintiff testified that she takes care of her daughter. (Id.). Plaintiff stated that she feeds,

---

[2]Seroquel is an anti-psychotic drug indicated for the treatment of bipolar disorder and schizophrenia. See WebMD, http://www.webmd.com/drugs (last visited August 21, 2013).

[3]Percocet is indicated for the relief of moderate to moderately severe pain. See Physician's Desk Reference ("PDR"), 1127 (63rd Ed. 2009).

plays with, bathes, dresses, and shops for her daughter.  (Tr. 68-69).  Plaintiff testified that she also shops for clothing for herself.  (Tr. 69).

Plaintiff stated that she has one friend.  (Id.).  Plaintiff testified that she and her friend go to a park to socialize with people.  (Tr. 70).  Plaintiff stated that she has not been to the park since her brother was killed.  (Id.).

Plaintiff testified that she cooks meals in the microwave, and she fries chicken.  (Tr. 71).

Plaintiff stated that she manages her own money.  (Id.).  Plaintiff testified that she deposits money into her bank account until she needs it, and she does not overdraw her account.  (Id.).

Plaintiff stated that she plans to move back in with her mother when her aunt moves out.  (Tr. 72).  Plaintiff testified that she does not feel safe staying in the apartment alone because a shooting recently occurred in her building.  (Tr. 72).  Plaintiff stated that there is a lot of gang-related crime in her neighborhood.  (Id.).

Plaintiff testified that she enjoys playing computer games, and doing word puzzles.  (Id.).  Plaintiff stated that she no longer has a computer.  (Id.).

Plaintiff's attorney examined plaintiff, who testified that she also worked at Lajuana's Daycare for three months.  (Tr. 73).  Plaintiff stated that the owner was her aunt, and she left this position due a dispute that occurred within her family.  (Id.).

Plaintiff testified that Dr. Lipede referred her to Dr. Sanjeev Kamat.  (Tr. 74).  Plaintiff stated that she saw Dr. Kamat infrequently due to Dr. Kamat's full schedule.  (Id.).  Plaintiff stated that Dr. Lipede prescribed her medication when she was unable to see Dr. Kamat.  (Id.).

Plaintiff testified that she has thoughts that someone is out to get her, and she fears being around other people.  (Tr. 75).  Plaintiff stated that she has harmed herself intentionally.  (Id.).

Plaintiff testified that she took an overdose of pills, and tried to cut her wrists because she was unhappy. (Tr. 75-76). Plaintiff stated that she reported she was sad and depressed to Dr. Kamat in June 2010 because she was thinking about her brother's death. (Tr. 76).

Plaintiff testified that she still thinks about her brother's death when her medication wears off. (Id.). Plaintiff stated that her medication wears off at bedtime, and she then takes sleeping pills. (Tr. 77). Plaintiff testified that she is able to sleep well about four nights a week with the sleeping pills. (Id.). Plaintiff stated that on the other nights, she lies awake thinking about her brother. (Tr. 78). Plaintiff testified that, when she does not sleep well at night, she feeds her baby and then goes back to sleep for the rest of the day. (Id.). Plaintiff stated that her aunt takes care of her baby on these days. (Id.).

Plaintiff testified that she experienced recent thoughts of harming herself, but she has not attempted to harm herself recently. (Tr. 79). Plaintiff stated that she still experiences mood swings when she takes Seroquel. (Tr. 80). Plaintiff testified that she feels fine one moment, and the next minute she "clicks," and gets into an argument. (Id.). Plaintiff stated that she argues with "everybody," her aunt, her mother and her siblings. (Id.).

Plaintiff testified that she has never liked people telling her what to do. (Tr. 81). Plaintiff stated that her mother kicked her out of her home for this reason. (Id.). Plaintiff testified that she has arguments on the job due to this problem as well. (Id.).

The ALJ indicated that he would order a psychological evaluation for plaintiff. (Tr. 82).

**B.** **Second Administrative Hearing**

A second administrative hearing was held on February 4, 2011. (Tr. 13). Plaintiff was present and was represented by counsel. (Id.). Also present were medical experts James Reid and Ann Winkler; and vocational expert Delores Gonzalez. (Id.).

The ALJ indicated that he would leave the record open for thirty days to allow plaintiff's attorney to submit records from anger management classes plaintiff attended as a result of recent charges. (Tr. 14).

Plaintiff's attorney examined plaintiff, who testified that she was twenty-two years of age, and weighed 103 pounds. (Tr. 16).

Plaintiff stated that, since her last hearing, she worked for daycares through a temp service. (Id.). Plaintiff testified that she worked at Agape Academy and the YWCA. (Id.). Plaintiff stated that she got into an altercation with a parent and was fired. (Id.). Plaintiff stated that she was charged with assault as a result of the incident. (Id.). Plaintiff testified that her employer arranged for a hearing, a "decision date," but she did not attend so she was terminated. (Tr. 17). Plaintiff stated that she did not attend the hearing because she was hospitalized due to a suicide attempt. (Id.). Plaintiff testified that she worked for the temp agency intermittently for about three months. (Id.).

Plaintiff stated that she has been terminated from other positions for fighting with customers or other employees. (Tr. 18).

Plaintiff testified that her probation officer recommended that she take anger management classes. (Id.). Plaintiff stated that she took the anger management class and she plans to take a parenting class as well. (Id.).

Plaintiff testified that she was admitted at Christian Hospital after she took forty-five sleeping pills. (Tr. 19). Plaintiff stated that she took the pills because she was stressed, was having anxiety attacks, and could not stop crying. (Id.). Plaintiff testified that she has daily thoughts of committing suicide. (Id.). Plaintiff stated that she last made a suicide attempt the day her brother was killed. (Id.).

Plaintiff testified that her mother tried to commit suicide in front of plaintiff by taking sleeping pills. (Tr. 20). Plaintiff stated that she was sexually or physically abused by a cousin at the age of eight. (Id.). Plaintiff testified that her mother did not believe her when she told her about the abuse. (Id.).

The ALJ examined plaintiff, who testified that she performed child care work at both of her temp jobs. (Tr. 21). Plaintiff stated that the altercation with the parent started when the parent asked plaintiff why her baby was crying. (Id.). Plaintiff testified that words were exchanged, then the parent pushed plaintiff, and plaintiff pushed her back. (Id.). Plaintiff stated that she then started punching the parent. (Tr. 22).

Plaintiff testified that her mother cares for her daughter when she works. (Id.). Plaintiff stated that Social Services required her to take a parenting class because she tried to commit suicide in front of her daughter. (Id.).

Plaintiff testified that she did not work full-time at the daycare position. (Tr. 23). Plaintiff stated that the hours and days she worked changed frequently, but she worked an average of 21 hours a week. (Id.). Plaintiff testified that she earned $7.50 an hour. (Id.).

The ALJ next examined medical expert Dr. Ann Winkler, who testified that she was board certified in internal medicine and rheumatology. (Tr. 24). Dr. Winkler stated that she had

reviewed plaintiff's medical records, and she had listened to her testimony. (Tr. 25).

Dr. Winkler testified that plaintiff has the following physical impairments: mild low white blood count, mechanical low back pain, and a diagnosis of asthma. (Tr. 25-26). Dr. Winkler stated that none of plaintiff's impairments equal a listing. (Tr. 26). Dr. Winkler testified that plaintiff would probably be limited to lifting and carrying no more than fifty pounds occasionally, and twenty pounds frequently; and should avoid concentrated exposure to dust, fumes, odors and gases due to the questionable diagnosis of asthma. (Tr. 26-27).

The ALJ next examined Dr. James Reid, who testified that he was a licensed clinical psychologist. (Tr. 27). Dr. Reid stated that plaintiff has been diagnosed with chronic paranoid schizophrenia,[4] bipolar disorder,[5] and major depression.[6] (Tr. 30). Dr. Reid testified that he did not find any credible evidence that plaintiff is psychotic or has been psychotic in the past. (Id.). Dr. Reid stated that a consultative psychologist noted credibility issues, which suggests plaintiff was motivated to communicate that she was very psychologically disturbed when that did not appear to be the case. (Tr. 30-31).

Dr. Reid stated that plaintiff was hospitalized at Christian Hospital in November 2010 for being suicidal, and was diagnosed with bipolar affective disorder, personality disorder,[7] and a

---

[4]Schizophrenia characterized predominantly by delusions of persecution and megalomania. See Stedman's Medical Dictionary, 1729 (28th Ed. 2006).

[5]An affective disorder characterized by the occurrence of alternating manic, hypomanic or mixed episodes and with major depressive episodes. Stedman's at 568.

[6]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Stedman's at 515.

[7]General term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior lifestyle, and

GAF score of 15[8] on discharge.  (Tr. 31).  Dr. Reid testified that plaintiff was having conflict with

her family, problems with her boyfriend, her car was stolen, she was experiencing economic

problems, and she was not taking her prescribed medication.  (Id.).  Dr. Reid stated that, for these

reasons, the most appropriate diagnosis would have been adjustment disorder[9] with depressed

mood and non-compliance.  (Id.).

Dr. Reid testified that plaintiff has a pattern of angry affect and altercations.  (Id.).  Dr.

Reid stated that he believes the most appropriate diagnosis to consider is borderline personality

disorder,[10] intense and unstable interpersonal relationships, and impulsive and damaging behavior.

(Id.).  Dr. Reid stated that there is also an issue of medication compliance.  (Tr. 32).

Dr. Reid testified that plaintiff's condition would not meet or equal a listing when she is

compliant with medication management and treatment follow-up.  (Id.).

Dr. Reid testified that he would limit plaintiff as follows: mildly impaired activities of daily

---

social adjustment, which patterns may manifest in impaired judgment, affect, impulse control and
interpersonal functioning.  Stedman's at 570.

[8]A GAF score of 11 to 20 denotes "[s]ome danger of hurting self or others (e.g., suicide
attempts without clear expectation of death; frequently violent; manic excitement) OR
occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment
in communication (e.g., largely incoherent or mute)."  Diagnostic and Statistical Manual of
Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[9]A disorder the essential feature of which is a maladaptive reaction to an identifiable
psychological stress, or stressors, that occurs within weeks of the onset of the stressors and
persists for as long as six months.  Stedman's at 567.

[10]An enduring and pervasive pattern that begins by early adulthood and is characterized by
impulsivity and unpredictability, unstable interpersonal relationships, inappropriate or uncontrolled
affect, especially anger, identity disturbances, rapid shifts of mood, suicidal acts, self-mutilation,
job and marital instability, chronic feelings of emptiness or boredom, and intolerance of being
alone.  Stedman's at 568.

living; moderately impaired social functioning; no limitations for simple routines, repetitive tasks; moderate limitations for complex tasks; and limited interaction with co-workers and supervisors. (Tr. 33-34).

Plaintiff's attorney examined Dr. Reid, who testified that he believed plaintiff's discharge GAF score of 15 after her hospitalization was a mistake and that this was her GAF score at admission. (Tr. 34).

Dr. Reid testified that he agreed with the consultative examiner that plaintiff may be very inconsistent and unreliable at work if she were untreated. (Tr. 36). Dr. Reid stated that he disagreed that plaintiff has moderate to severe problems adapting to social and environmental demands of a work environment. (Id.).

The ALJ examined vocational expert Delores Gonzalez, who testified that plaintiff's past work is classified as follows: hair braider (sedentary, semi-skilled); rink monitor (light, unskilled); cashier (light, unskilled); retail sales clerk (light, semi-skilled); and daycare worker (light, semi-skilled). (Tr. 38-39).

The ALJ asked Ms. Gonzalez to assume a hypothetical claimant with plaintiff's background and the following limitations: lift fifty pounds occasionally, and twenty pounds frequently; stand or walk six hours out of eight; sit six hours out of eight; must avoid concentrated exposure to fumes, odors, dust, and gas; can understand, remember, and carry out simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple work-related decisions; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; can adapt to routine, simple work changes; and can perform repetitive work according to set procedures, sequence and pace. (Tr. 39). Ms.

Gonzalez testified that the individual would be unable to perform any past work, but could perform other light, unskilled work such as mail clerk (131,750 positions nationally; 3,430 in Missouri); and stock checker (140,680 positions nationally, 4,500 in Missouri).  (Id.).

The ALJ next asked Ms. Gonzalez to assume the same limitations as the first hypothetical with the following addition: respond appropriately to supervisors in a task-oriented setting where contact with co-workers and others is casual and infrequent.  (Tr. 40).  Ms. Gonzalez testified that this limitation would not impact the jobs she mentioned.  (Id.).

The ALJ asked Ms. Gonzalez to assume the limitations from the second hypothetical with the following change: delete the limitation of perform repetitive work according to set procedure, sequence or pace; and add can perform work at a normal pace without production quotas.  (Id.).  Ms. Gonzalez testified that this change would not affect the jobs he discussed.  (Id.).

The ALJ finally asked Ms. Gonzalez to assume the limitations from the third hypothetical, with the following addition: the individual will have one confrontation per month with supervisors, co-workers or the public in the workplace.  (Id.).  Ms. Gonzalez testified that such an individual would have great difficulty maintaining employment.  (Id.).

Plaintiff's attorney examined Ms. Gonzalez, who testified that an individual who were unreliable and unable to stay on task to complete projects would have difficulty maintaining competitive employment.  (Tr. 41).

Ms. Gonzalez testified that an individual who was limited to occasional interaction to at times no interaction with employees or the public would be capable of performing the jobs she mentioned.  (Tr. 42).

Ms. Gonzalez testified that an individual who would occasionally require repetition of

instructions and assistance in completing tasks would require special accommodation in order to be employed and could possibly work only with a job coach or in a sheltered workshop situation. (Id.).

## C.    Relevant Medical Records

Plaintiff received treatment for various complaints from A.G. Lipede, M.D., beginning in May 2009.  (Tr. 302-14).  Dr. Lipede diagnosed plaintiff with lumbosacral spondylosis,[11] and prescribed Percocet and Flexeril[12] in June 2009.  (Tr. 306-07).  On July 28, 2009, plaintiff reported homicidal thoughts when frustrated.  (Tr. 305).  Dr. Lipede diagnosed plaintiff with bipolar disorder and prescribed Seroquel.  (Id.).

State agency psychologist Kyle DeVore Ph.D completed a Psychiatric Review Technique on October 7, 2009, in which he expressed the opinion that plaintiff's impairments were not severe and caused only mild limitations in plaintiff's activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace.  (Tr. 316-26).

Plaintiff presented to Sanjeev Kamat, M.D., at St. Louis Psychiatry Doctors Group on November 16, 2009, with complaints of feeling depressed and hearing voices.  (Tr. 329).  Plaintiff reported that she hears her dead brother's voice and sees him at times.  (Id.).  Plaintiff was not having any manic symptoms, although she reported manic symptoms in the past.  (Id.).  Upon examination, plaintiff's behavior was appropriate, she was cooperative, spontaneous, coherent, her affect was reactive, her thought process was linear and logical, she had no suicidal or

_____

[11]Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature.  Stedman's at 1813.

[12]Flexeril is a skeletal muscle relaxant which relieves muscle spasm of local origin without interfering with muscle function.  See PDR at 966.

homicidal ideations, average intellectual function, and fair insight and judgment. (Tr. 331-32).

Dr. Kamat diagnosed plaintiff with chronic paranoid schizophrenia; and bipolar affective disorder, type I; with a GAF score of 60-65.[13] (Tr. 332). He increased plaintiff's dosage of Seroquel. (Id.).

Plaintiff presented to Dr. Kamat on June 25, 2010, at which time she complained of depression, hearing voices, and difficulty sleeping well at night. (Tr. 338). Plaintiff's mental status examination and diagnoses were unchanged from her last visit. (Id.). Dr. Kamat continued plaintiff's Seroquel and prescribed Lunesta.[14] (Id.).

Plaintiff saw Dianna Moses-Nunley, Ph.D., for a consultative psychological examination on September 23, 2010. (Tr. 341-45). Plaintiff indicated that she was diagnosed with bipolar disorder in the tenth grade. (Tr. 341). Plaintiff reported that she graduated from high school, earning a C average, and denied receiving special education services. (Id.). Upon mental status examination, plaintiff was cooperative, denied auditory or visual problems, her speech was coherent and organized, and she described her mood as "I don't know, I feel OK." (Tr. 341-42). Dr. Moses-Nunley noted the following findings: plaintiff was alert, her immediate memory was fair, remote memory was adequate, insight was limited as to her mental health issues, judgment was adequate, concentration and working memory were in the low average range, and she

---

[13]A GAF score of 51 to 60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32. A GAF score of 61 to 70 denotes "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." Id.

[14]Lunesta is indicated for the treatment of insomnia. See PDR at 2995.

- 14 -

demonstrated poor basic abstract reasoning. (Tr. 342). Dr. Moses-Nunley administered the

Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV), which revealed overall functioning

in the borderline range, with a relative strength in her processing speed and weaker verbal skills

and knowledge. (Id.). Dr. Moses-Nunley indicated that plaintiff's responses during psychological

symptoms testing indicated significant mood problems, however her profile suggests "gross

exaggeration of symptoms that is inconsistent with other information about this claimant." (Tr.

345). Dr. Moses-Nunley also noted that plaintiff's poor performance on the "Trail making test,"

a measure of general brain functions, was inconsistent with her WAIS-IV performance, and

suggests poor effort on that portion of the testing. (Id.). Dr. Moses-Nunley diagnosed plaintiff

with major depressive disorder, recurrent, moderate; borderline intellectual functioning; and a

GAF score of 57. (Tr. 345). Dr. Moses-Nunley stated that plaintiff's testing results reveal that

she has sufficient intellectual capability to manage the demands of everyday living but her mood

affects her approach to tasks so that her motivation, effort and therefore performance may be very

inconsistent and unreliable. (Id.). Dr. Moses-Nunley stated that this is likely to translate into

plaintiff's educational, occupational, and daily life settings affecting her task persistence and

effectiveness. (Id.). In addition, she noted that plaintiff's self-reporting suggests that she is likely

to have moderate to severe problems adapting to the social and environmental demands of work

environments. (Id.). Dr. Moses-Nunley stated that plaintiff's ability to understand, carry out, and

remember instructions will likely depend on the extent to which they rely on her weaker verbal

abilities. (Id.). Overall, Dr. Moses-Nunely stated that plaintiff is likely to struggle with

comprehension and memory for instructions to a moderate degree and may require some

repetition and assistance. (Id.). She indicated plaintiff is capable of managing her own funds in

her best interests.  (Id.).

Plaintiff was admitted at Christian Hospital from November 13, 2010, through November 19, 2010, after an overdose attempt by taking thirty tablets of Lunesta.  (Tr. 359).  Plaintiff had taken herself off medication and reported increased depression and stress secondary to a dysfunctional relationship with her mother, breaking up with her boyfriend, her car being stolen causing her to have to take a leave of absence from work due to lack of transportation, financial problems, and not being able to take care of her two-year-old daughter properly.  (Tr. 359, 366).  Plaintiff was diagnosed with depression, and was given a GAF score of 15.  (Tr. 367).  Plaintiff was given appropriate psychotropic medications, and was released in stable condition.  (Tr. 357).  Plaintiff's discharge diagnoses were bipolar affective disorder, personality disorder, and a GAF score of 15.  (Tr. 357).

## The ALJ's Determination

The ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since August 24, 2009, the date the application was protectively filed (20 CFR 416.971 *et seq*.).

2.      The claimant has the following severe impairments: a major depressive disorder, a borderline intellectual functioning disorder, and asthma (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant must avoid concentrated exposure to fumes, odors, dust, and gases.  She can understand, remember, and carry out at least simple instructions and non-detailed tasks.  The claimant demonstrates

adequate judgment to make simple work-related decisions and can respond appropriately to supervisors in a task-oriented setting where contact with coworkers and others is casual and infrequent. The claimant can adapt to routine, simple work, and she can perform work at a normal pace without production quantities.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on February 8, 1988 and, on August 24, 2009, the date the application was protectively filed, was 21 years old, which is defined as a younger individual age 18-49 (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since August 24, 2009, the date the application was protectively filed (20 CFR 416.920(g)).

(Tr. 91-102).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on August 24, 2009, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 102).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.**     **Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in determining plaintiff's mental RFC.[15] Specifically, plaintiff contends that the ALJ failed to point to medical evidence in support of his finding.  Plaintiff next argues that the hypothetical question posed to the vocational expert was erroneous.  The undersigned will discuss plaintiff's claims in turn.

The ALJ made the following determination with regard to plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except the claimant must avoid concentrated exposure to fumes, odors, dust, and gases.  She can understand, remember, and carry out at least simple instructions and non-detailed tasks.  The claimant demonstrates adequate judgment to make simple work-related decisions and can respond appropriately to supervisors in a task-oriented setting where contact with coworkers and others is casual and infrequent.  The claimant can adapt to routine, simple work, and he can perform work at a normal pace without production quantities.

(Tr. 93).

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations.  Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.  See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC);

---

[15]Plaintiff does not challenge the ALJ's findings with regard to her physical limitations.

Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

The ALJ provided a detailed summary of the medical evidence. (Tr. 94-100). The ALJ first discussed the treatment notes of psychiatrist Dr. Kamat. (Tr. 94-95). In November 2009, plaintiff complained of depression and hearing voices. (Tr. 329). The ALJ noted that Dr. Kamat found on examination that plaintiff's behavior was appropriate and cooperative, her speech was spontaneous and coherent; her mood was sad and her affect was reactive, but her thought process was linear and logical, with no poverty of speech, no flight of ideas, no looseness, and no tangentiality; plaintiff had no suicidal thoughts and no paranoia or delusions; her intellectual function was average; and her insight and judgment were fair. (Tr. 94, 331-32). Dr. Kamat diagnosed plaintiff with chronic paranoid schizophrenia and bipolar affective disorder, and assessed a GAF score of 60-65. (Id.). The ALJ properly noted that a GAF score of 60 to 65 indicates only mild to moderate limitations. (Tr. 95). In June 2010, Dr. Kamat's findings on mental status examination and diagnoses remained unchanged. (Tr. 338, 95). The ALJ noted that, although plaintiff was to return in two weeks, she never returned. (Id.). The ALJ indicated that he was giving little weight to Dr. Kamat's diagnoses due to the objective medical findings, the inconsistencies between plaintiff's allegations and the record, and the fact that the medical expert, Dr. Reid, called into question Dr. Kamat's diagnoses. (Tr. 95). The record supports the ALJ's finding.

The ALJ next discussed in detail the report of consultative psychologist Dr. Moses-

Nunley. (Tr. 95-96). The ALJ indicated that Dr. Moses-Nunley noted the following findings on examination: plaintiff was alert and well-oriented, her immediate memory was fair, her remote memory was adequate, her insight and judgment were adequate, and her insight regarding her mental issues was limited. (Tr. 95, 342). The ALJ stated that these objective medical findings do not support plaintiff's allegations of a disabling impairment. (Tr. 95). The ALJ noted that plaintiff's scores on the Trail Marking test, a measure for the adequacy of general brain functions, led Dr. Moses-Nunley to believe that plaintiff "may have made an effort 'to minimize her strengths and emphasize her pathology.'" (Tr. 96, 343). The ALJ also pointed out that Dr. Moses-Nunley questioned the validity of plaintiff's personality test because she believed that plaintiff might have skewed the results as the test sore was a strong indicator of exaggerated symptoms. (Tr. 96, 344). Dr. Moses-Nunley diagnosed plaintiff with major depressive disorder, recurrent, moderate; and borderline intellectual functioning, and assessed a GAF sore of 57, indicating moderate symptoms. (Tr. 96, 345). Dr. Moses-Nunley concluded that plaintiff's profile suggested "gross exaggeration of symptoms that is consistent with other information about this claimant." (Tr. 96, 345). Dr. Moses-Nunley also noted that plaintiff's poor performance on the Trail Making test is consistent with her WAIS-IV performance and suggests poor effort on that portion of the testing. (Id.). The ALJ found that these facts regarding plaintiff's test performance and exaggerated responses "severely undermine" plaintiff's credibility. (Tr. 96).

The ALJ noted that Dr. Moses-Nunley found as follows: plaintiff likely has sufficient intellectual capability to manage the demands of everyday living but her mood affects her approach to tasks so that her motivation, effort, and performance may be very inconsistent and

unreliable, which is likely to influence plaintiff's educational, occupational, and daily life settings affecting her task persistence and effectiveness. Plaintiff's self-reporting suggests that she is likely to have moderate to severe problems adapting to the social and environmental demands of work environments, and her ability to understand, carry out, and remember instructions will likely depend on the extent to which they rely on her weaker verbal abilities. Plaintiff is likely to struggle with comprehension and memory for instructions to a moderate degree and may require some repetition and assistance. Finally, plaintiff is capable of managing her own funds. (Tr. 96, 345). The ALJ indicated that Dr. Moses-Nunley is a psychological specialist and, as such, he was assigning "significant weight" to her opinions in assessing plaintiff's mental health status and RFC. (Tr. 96).

The ALJ discussed plaintiff's admission at Christian Hospital in November 2010 for a drug overdose. (Tr. 96-97). The ALJ indicated that plaintiff reported increased stress, financial problems, not being able to care for her daughter, and that her boyfriend had moved out on the day of the overdose. (Tr. 97, 359, 366). Significantly, the ALJ pointed out that plaintiff had stopped taking her medication. (Id.). The ALJ stated that these facts do not support plaintiff's allegations of disabling impairments. (Tr. 97). The ALJ acknowledged that plaintiff was discharged with a GAF score of 15, but stated that, as noted by medical expert Dr. Reid, the record is inconsistent with a GAF score this low and that this must have been an error. (Id.).

Finally, the ALJ discussed the testimony of medical expert Dr. Reid, a clinical psychologist. (Tr. 98-99). Dr. Reid testified that he was skeptical of Dr. Kamat's diagnosis of chronic paranoid schizophrenia because plaintiff's reports of hearing voices were not substantiated by credible evidence and there was no evidence plaintiff was ever psychotic. (Tr.

98, 30).  Dr. Reid stated that, even if there were evidence of psychotic behavior, Dr. Kamat assessed a GAF score of 60 to 65, which is indicative of only mild symptoms.  (Id.).  Dr. Reid indicated that he agreed with Dr. Moses-Nunley's credibility concerns due to the testing discrepancies noted by Dr. Moses-Nunley, which indicates that plaintiff was motivated to show severe symptoms.  (Tr. 98, 30-31).  As mentioned previously, Dr. Reid disagreed with the GAF score of 15 assessed by Christian Hospital on discharge, noting that a patient with a GAF score of 15 would never be discharged.  (Tr. 99, 35).  Dr. Reid also testified that he disagreed with the diagnoses of bipolar affective disorder and a personality disorder, and indicated that a diagnosis of adjustment disorder with a depressed mood would be more accurate given the evidence of stress in her life at that time.  (Tr. 99, 31).  Dr. Reid indicated that plaintiff's medication non-compliance was a significant issue.  (Tr. 99, 32).  Dr. Reid stated that he believes the most appropriate diagnosis to consider is borderline personality disorder due to plaintiff's anger issues.  (Tr. 99, 31).

The ALJ noted that Dr. Reid expressed the opinion that plaintiff has mild limitations of activities of daily living, moderate limitations in social functioning, no limitations in her ability to perform simple, routine, repetitive tasks; and moderate limitations in her ability to perform complex tasks because she has not learned how to interact appropriately with others when she becomes angry.  (Tr. 99, 33).  Dr. Reid also found that plaintiff's contact with co-workers and her supervisors must be limited.  (Id.).  The ALJ indicated that he was assigning "significant weight" to Dr. Reid's opinions, as they are based on an in-depth analysis of the record and are consistent with the record as a whole.  (Tr. 99).

Contrary to plaintiff's claim that the ALJ cited no medical evidence in support of his RFC

determination, the ALJ provided an exhaustive analysis of the medical evidence and indicated the opinion evidence on which he relied. Specifically, the ALJ stated that he was assigning significant weight to the opinions of Drs. Moses-Nunley and Reid.

Plaintiff contends that the ALJ erred in failing to adopt all of the limitations found by Dr. Moses-Nunley. The ALJ, however, was not required to adopt every limitation found by Dr. Moses-Nunley. See Martise v. Astrue, 641 F.3d 909, 927 (8th Cir. 2011) ("the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians"). Rather, the ALJ need only include those limitations he finds to be established by the record. "[The court] review[s] the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but [the court] do[es] not require an ALJ to mechanically list and reject every possible limitation." McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011). The omitted limitations depend on plaintiff being found credible, which the ALJ did not find.

As previously discussed, Dr. Moses-Nunley indicated in her report that there was evidence of "gross exaggeration of symptoms." (Tr. 344). The ALJ properly found that this evidence greatly detracted from plaintiff's credibility regarding the severity of her psychiatric symptoms. In assessing the credibility of plaintiff's complaints regarding the severity of her symptoms, the ALJ also considered that plaintiff did not receive regular psychiatric treatment. The failure to seek regular medical treatment detracts against a claimant's credibility. See Casey v. Astrue, 503 F.3d 687, 693 (8th Cir. 2007). In addition, the ALJ noted evidence of noncompliance with her psychiatric medication. Failure to follow a prescribed course of treatment may detract from a claimant's credibility. See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003).

In sum, the ALJ included all credible limitations in determining plaintiff's RFC. The ALJ's determination is supported by the objective evidence, including the opinions of Drs. Moses-Nunley and Reid. Thus, the ALJ's RFC determination is supported by substantial evidence in the record as a whole.

The hypothetical question posed to the vocational expert is based on the ALJ's RFC assessment. Thus, the vocational expert's testimony that jobs existed that plaintiff could perform constitutes substantial evidence supporting the Commissioner's decision. See Buckner v. Astrue, 646 F.3d 549, 561 (8th Cir. 2011).

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this  16th  day of September, 2013.

Lewis M. Blanton

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE